## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**COREY SMITH #205818**                                    **CIVIL ACTION**

**versus**                                                        **NO. 07-1504**

**N. BURL CAIN, WARDEN**                            **SECTION: "F" (1)**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Corey Smith, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On April 17, 2002, he was convicted of two counts of aggravated rape, one count of attempted aggravated rape, four counts of forcible rape, one count of oral sexual battery, two counts of possession of child pornography, one count of sexual battery, and one count of attempted oral sexual battery, all in violation of Louisiana law.[2]  In May 24, 2002, he was sentenced to the following terms of imprisonment:  life imprisonment on each of the two aggravated rape convictions; fifty years on the attempted aggravated rape conviction; twenty-five years on each of the forcible rape convictions; ten years on the oral sexual battery conviction; ten years on each of the two possession of child pornography convictions; five years on the sexual battery conviction; and three years on the attempted oral sexual battery conviction.   It was ordered that all sentences be served consecutively and without benefit of probation, parole, or suspension of sentence.  On that same date, he was also found to be a multiple offender and was resentenced as such on the attempted aggravated rape conviction to a consecutive term of fifty years imprisonment without benefit of probation, parole, or suspension of sentence.[3]  On May 7, 2003, the Louisiana Fourth Circuit Court of Appeal reversed the convictions and sentences on the oral sexual battery conviction and one of the aggravated rape convictions; however, the remaining convictions and sentences were affirmed.[4]

---

[2]  State Rec., Vol. VI of VI, transcript of April 17, 2002, pp. 8-9; State Rec., Vol. II of VI, minute entry dated April 17, 2002.

[3]  State Rec., Vol. VI of VI, transcript of May 24, 2002; State Rec., Vol. II of VI, minute entry dated May 24, 2002.

[4]  State v. Smith, No. 2002-KA-1813 (La. App. 4th Cir. May 7, 2003) (unpublished); State Rec., Vol. II of VI.  The prosecution subsequently entered a *nolle prosequi* as to reversed counts. State Rec., Vol. II of VI, minute entry dated September 18, 2003.

Petitioner then filed with the Louisiana Supreme Court an application for a writ of certiorari and prohibition[5] which was denied on December 12, 2003.[6]

On or about August 26, 2004, petitioner filed with the state district court an application for post-conviction relief.[7] When he received no ruling on that application, he filed with the Louisiana Fourth Circuit Court of Appeal an application for a writ of mandamus.[8] The appellate court construed that application as one for a supervisory writ and denied the post-conviction claims on the merits.[9] Petitioner then filed with the Louisiana Supreme Court an application for a writ of certiorari[10] which was denied on February 2, 2007.[11]

On March 26, 2007, petitioner filed this federal application for *habeas corpus* relief.[12] In support of his application, he raises the following claims:

1.    The imposition of consecutive sentences constitutes excessive punishment;

---

[5] State Rec., Vol. III of VI.

[6] <u>State v. Smith</u>, 860 So.2d 1152 (La. 2003) (No. 2003-K-1582); State Rec., Vol. VI of VI.

[7] State Rec., Vol. V of VI.

[8] State Rec., Vol. V of VI.

[9] <u>State v. Smith</u>, No. 2006-K-0307 (La. App. 4th Cir. Apr. 11, 2006) (unpublished); State Rec., Vol. V of VI.

[10]   State Rec., Vol. III of VI.

[11]   <u>State *ex rel.* Smith v. State</u>, 948 So.2d 192 (La. 2007) (No. 2006-KH-1419); State Rec., Vol. II of VI.

[12] Rec. Doc. 3.

    2.      Petitioner received ineffective assistance of counsel; and

    3.      The prosecutor made improper remarks during closing argument.

The state does not challenge either the timeliness of petitioner's federal application or his exhaustion of his state court remedies.

<u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but

unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams[ v. Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); <u>see also</u> <u>Hill</u>, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

<u>Facts</u>

On direct appeal, the Louisiana Fourth Circuit Court of Appeals summarized the facts of this case as follows:

> Shana Watson, a friend of the victim, L.J., testified that on the evening of August 19, 2000 she and another friend, Maxine Thompson, called L.J. on the telephone and asked L.J. if the defendant was "messing with her" and did she want the defendant to stop "messing with her." L.J. told Shana that the defendant had been sexually molesting her and that she wanted it to stop. When Shana got off of the phone with L.J., she called the police department.
>
> Maxine Thompson testified, corroborating Watson's testimony of their telephone conversation with the victim. She stated that she knew the victim from the neighborhood.
>
> Detective Larry Singleton, an officer with the New Orleans Police Department Juvenile Bureau, testified that he received a complaint of possible sexual abuse on August 19, 2000 and went to the victim's residence at approximately 2:00 a.m. on August 20, 2000. The officer stated that he spoke first with the victim's mother and then with the victim. He was advised that the defendant was asleep in the back bedroom of the house. After corroborating the complaint received over the telephone, Detective Singleton arrested the defendant for the crime of aggravated rape. During his conversation with the victim and the victim's mother, he learned of

the existence of certain photographs and a disposable camera, which he confiscated.  The officer also learned that additional photographs may have existed and asked the victim's mother to look for the photographs.  Detective Singleton also spoke with the victim's brother, K.J.  The brother had witnessed an incident, which occurred only a few days before.  He then took the victim to University Hospital for a sexual assault examination.  Later that day, the victim's mother notified Detective Singleton that she found additional photographs.

C.J., the victim's mother, testified that the defendant had lived with her and her three children, including L.J., for seven years.  L.J., whose date of birth was April 22, 1987, was only two years old when the defendant moved in with them.  In August of 2000, one of her sons told her that the defendant was having sex with L.J.  She questioned the defendant and L.J. together and they both denied the allegation.  In the early morning hours of August 20, 2000, police officers came to her house.  The officers informed her that a complaint had been made about the defendant and L.J.  The officers spoke to her and L.J.  During the conversation, the existence of photographs and a disposable camera was discussed.  She knew the defendant had a camera and had taken some photographs around the house.  The defendant told her that he had stolen the camera from work.  Some photographs and a disposable camera were found and given to the police officers.  After the police left, she searched the house and found additional photographs in the back of a television set.  Included in each set of photographs were nude photographs of L.J.

K.J., the victim's brother, testified that only a few days before the defendant was arrested, he walked into his mother's bedroom and saw the defendant lying on top of L.J.  The defendant jumped up and wrapped himself with a blanket.  The defendant claimed he was looking for the television remote.  The witness stated that he could tell that the defendant was "erect."  L.J. was lying face down on a mat near the bedroom and her pants were down.  She pretended to be asleep.  K.J. testified that he was shocked and mad.  He told his younger brother who then told their mother about the incident.  K.J. stated that he was asleep when the police came to his house.  He thought that his mother had called the police.  He spoke with the police officer and told him what he had seen.  He helped his mother search for photographs and found some photographs in the back of a television set in his room.  K.J. testified that on another occasion, he attempted to enter his bedroom but the door was locked.  He

knocked, and the defendant walked out with L.J. behind him. The defendant told him that they were playing a game.

L.J. testified the defendant lived with her, her mother and her brothers since she was two years old. At first, the defendant was like a father to her. When she turned eleven years old, he began molesting her. One of the first occasions occurred in October of 1998. Her mother was at work and her brothers were at school. The defendant let her stay home from school because it was raining. L.J. was sleeping in her mother's bedroom when the defendant woke her up and told her to put on her bathing suit. He wanted her to dance for him. After she complied with his request, she lay down on a mat near her mother's bed. The defendant was lying on her mother's bed. The defendant then got on top of her. She became scared. He then attempted oral sex but she started crying. The defendant told her he was sorry and let her go back to sleep. A short time later, he woke her up again and told her to go into the bathroom. He put a blindfold on her eyes and told her to bend over. She was very scared. The defendant put Vaseline on his fingers and stuck his fingers in her vagina. She said that it hurt her. The next incident occurred the next day. This time he penetrated her digitally and with his penis. She told him that it hurt but he would not stop. L.J. stated that she did not tell anyone because she was scared and he threatened to hurt her and her family.

Another incident occurred in December of 1999 while her mother was not home and her brothers were playing outside. The defendant told L.J. he wanted to have sex with her. When she told him no, he went into the kitchen and got a knife. The defendant stabbed her in the hand and then raped her. The next incident occurred on Christmas Day in 1999. When her family arrived at her grandmother's house, her mother and her aunt realized that they had left some presents at home. The defendant offered to go get the presents. The defendant took L.J. and her cousin, April, with him. On the way to the house, there was an advertisement on the radio about a disc jockey at a local club. When they arrived at the house, April went into the kitchen to use the telephone to see if she could see the disc jockey. The defendant asked L.J. if she wanted to go to the club. She said that she would like to go to the club. The defendant told her that if she wanted to go, she would have to do something for him. L.J. told the defendant that she wanted to go back to her grandmother's house. The defendant took her into her mother's bedroom, locked the door and told her that she was going to have to do something if she wanted to go to the club. The

- 7 -

defendant threatened to hit her.  She complied and then they returned to her grandmother's house.

On that day, L.J. went with the defendant to take L.J.'s cousin and the cousin's friend to see a boy.  After the defendant dropped off L.J.'s cousin and the cousin's friend, the defendant took L.J. to a deserted area around Washington Avenue and told L.J. he wanted to have sex with her.  L.J. refused and the defendant told her he would make this her worst New Year's Day.  The defendant threatened to kill her and forced her to perform oral sex on him.  L.J. stated that she could not tell anyone because she was afraid of the defendant.

The defendant also attempted to molest her when the Super Fair was in New Orleans in 2000.  On the day of the incident, L.J. left the Superdome and was walking home with her brother.  A young boy that she knew was walking with them, trying to talk to her.  The defendant came up on a bicycle and hit her in the face.   The defendant gave the bicycle to L.J.'s brother and told him to ride the bicycle home.  The defendant took L.J. to a nearby bus stop.  He told L.J. that she should not be talking to boys.  He stated that he loved her.  When the defendant and L.J. got home, the defendant told L.J.'s mother that L.J. was talking to a boy and needed a whipping.  The defendant followed L.J. into her room and hit her with a baton.  The defendant then asked L.J. if she wanted to have sex with him.  L.J. replied in the negative.  The defendant hit her again with the baton.

On her birthday, April 22, 2000, the defendant told L.J. that he would get a disc jockey for her birthday.  L.J.'s mother was at work but was going to come home after work and fix dinner for her birthday.  The defendant asked L.J. to have sex with him.  She told the defendant to leave her alone for her birthday.  The defendant complied and they went shopping at a nearby mall where the defendant bought L.J. a compact disc.  When they arrived home, the defendant asked L.J. to have sex with her.  She stated that she would not.  The defendant then threatened to harm her and stated that he would make it her worst birthday.

Another incident occurred in June of 2000.  L.J. was in the bathroom and the defendant walked in, telling her he had a surprise for her.  The defendant was holding a knife.  He told L.J. that he wanted her to perform oral sex on him.  She refused and they started fighting.  The defendant stabbed L.J. in the eye with a ballpoint pen.  L.J. ran out of the house crying.  She saw a friend outside who asked her what happened.  L.J. told her friend about the incident.

One day in August of 2000, L.J. was lying on her brother's mat in her mother's room.  L.J.'s cousin was sleeping in her mother's bed.  The defendant walked into the room, wearing boxers and a robe.  L.J.'s cousin woke up, and the defendant told the child to go get something to eat.  After the child left, the defendant got on top of L.J. and penetrated her with his penis.  She was lying face down on her stomach.  Her brother, K.J., walked in and saw the defendant.  The defendant jumped up and pretended to be looking for the television remote control.  After her brother left the room, the defendant continued to have sex with her.

L.J. also testified that the defendant took nude photographs of her.  The defendant forced her to pose for the photographs.  He told her how to pose for each photograph.  L.J. identified the photographs at trial.[13]

<u>Excessive Punishment</u>

Petitioner claims that the imposition of consecutive sentences constitutes excessive punishment.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected that claim, holding:

> The defendant also argues that the imposition of consecutive sentences is unconstitutionally excessive.  The statute governing concurrent and consecutive sentences, La. C.Cr.P. art. 883, provides:
>
>> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively.  Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.

---

[13]  <u>State v. Smith</u>, No. 2002-KA-1813, at pp. 3-8 (La. App. 4th Cir. May 7, 2003) (unpublished); State Rec., Vol. II of VI.

- 9 -

Louisiana law favors concurrent sentences; however, a trial judge retains the discretion to impose consecutive sentences on the basis of other factors, including the offender's past criminality, violence in the charged crimes, or the risk that the defendant poses to the general safety of the community.  State v. Thomas, 98-1144 (La. 10/9/98), 719 So.2d 49.  When consecutive sentences are imposed for crimes arising out of the same act, the trial judge must articulate particular justification for such a sentence beyond a mere articulation of the standard sentencing guidelines set forth in La. C.Cr.P. 894.1.  State v. Pittman, 604 So.2d 172 (La. App. 4 Cir. 1992).  Consecutive sentences for crimes arising out of the same act are not per se excessive if the trial judge considers other appropriate factors in imposing sentence.  Id.

In sentencing the defendant, the trial court stated:

> Let the record reflect as follows:  Each and every count of this bill of information (sic) involved separate and distinct acts of perversion and/or violence perpetrated upon a child.  Each and every one of the counts of the bill of indictment alleged and the defendant was convicted of 12 separate and distinct offenses.  Each offense was different from the other in either time period in which it was perpetrated or the manner in which it was perpetrated.  Based on the testimony and the facts presented to the jury as well as the Court at trial, the Court is convinced that there were no duplicate offenses, that each one of these twelve offenses was a separate and distinct criminal act.  For the edification of the Department of Corrections, the Court also notes as follows:  Aggravated rape, the conviction in count 1 is a crime of violence; sexual battery in count 2 is a crime of violence; attempted aggravated rape in count 3 is a crime of violence; forcible rape in count 4 is a crime of violence; forcible [rape] in count six is a crime of violence; forcible rape in count 7 is a crime of violence; aggravated rape in count 8 is a crime of violence; forcible rape in count 10 is a crime of violence.

> The defendant's date of birth is August 23, 1970.

The first rape perpetrated upon this child was between the 18th of October, 1998 and the 31st of October, 1998, making the defendant over the age of majority on the date these rapes began.  When the first rape was perpetrated upon this juvenile with the date of birth of April 22, 1987, she would have been approximately eleven years of age.  These acts of sexual predation continued to be perpetrated by the defendant upon this victim until on or about the 19th of August, 2000, a span of approximately three (sic) years.

Further, let the record reflect that upon the execution of a search warrant at the premises that the defendant shared with the victim and her mother on or about the 13th of August, 2000, members of the New Orleans Police Department discovered juvenile pornography that involved photographs of this child victim in compromising sexually explicit and frankly, quite disgusting poses.  The same is true for the search warrant executed by the police department on or about the 19th day of August, 2000.

The Court has taken into consideration in imposing sentence in this case the provisions of Article 894.1 of the Louisiana Code of Criminal Procedure and having reviewed that article with the facts of this case in mind, the Court makes the following findings:

That during any period of suspended sentence or probation that there is an undue risk that the defendant will commit another crime.  I find that the defendant is a sexual predator and is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution.  I find that any lesser sentences other than the sentences imposed in this case would deprecate the serious nature of the defendant's crime.  I find that the offender's conduct during the commission of these rapes upon this child manifest a deliberate cruelty to the victim in the manner in which the rapes were carried out.  I find that the defendant knew or should have known that the victim of this offense was particularly vulnerable or incapable of

- 11 -

resistence due to extreme youth.  I find that in several
of these counts of the bill of indictment, the offender
used threats of or actual violence in the commission
of these offenses.  Furthermore, I do not find any
mitigating circumstances in this case.  Each and every
sentence in this case is to be served consecutively
with one another and consecutively with any other
sentence that the defendant may be backing up,
including but not limited to any probation or parole
time that he might be backing up for any other
offenses that occurred prior to today's date.

The trial court found the defendant to be a risk to public
safety and specifically expressed the opinion that the defendant is a
sexual predator and is in need of correctional treatment or a custodial
environment.  The trial court believed that defendant was the worst
sort of offender of the crimes for which he was convicted.  In light of
these factors, the trial court did not abuse its discretion in ordering
the sentences to be served consecutively.  State v. Lee, 94-2584 (La.
App. 4 Cir. 1/19/96), 668 So.2d 420, 427.

This assignment is without merit.[14]

In discussing this claim, petitioner cites almost exclusively to state law provisions

and jurisprudence.  However, a claim that petitioner's punishment was excessive under *state law*

simply is not cognizable in this federal proceeding.  Federal *habeas corpus* relief is available only

for violations of *federal constitutional law* and, therefore, this Court does not sit to review alleged

errors of state law.  Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998).  Accordingly, this Court

will not review the state court's findings regarding the propriety of petitioner's punishment under

state law.  Smith v. Cain, No. 00-30887, 2001 WL 498441 (5th Cir. Apr. 9, 2001).

Further, to the extent that petitioner is claiming that his punishment is excessive

under the Eighth Amendment of the United States Constitution, his claim is without merit.

---

[14]  State v. Smith, No. 2002-KA-1813, at pp. 11-13; State Rec., Vol. II of VI.

Petitioner does not appear to contend that his individual sentences are excessive, and, in any event, they clearly are not.[15] Rather, petitioner appears to be arguing simply that his punishment as a whole was rendered excessive by the judge's order that the sentences be served consecutively rather than concurrently.  However, petitioner cites no authority for the proposition that the imposition of consecutive sentences under such egregious facts is impermissible under the United States

---

[15]   The United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence.  Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992).

The Fifth Circuit has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes a benchmark for disproportionate punishment under the Eighth Amendment."  United States v. Gonzales, 121 F.3d 928, 943 (5th Cir. 1997).  In Rummel, the Supreme Court upheld a petitioner's sentence to life imprisonment for obtaining $120.75 under false pretenses.  The sentence was imposed under a Texas recidivist statute and took into account petitioner's prior convictions for fraudulent use of a credit card and passing a forged check.  The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate  punishments is an inherently subjective judgment, defying bright lines and neutral principles of law.  Nevertheless, we can say with certainty that the life sentence approved in Rummel falls on the constitutional side of the line, thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.

Gonzales, 121 F.3d at 943 (footnote omitted).

In the instant case, petitioner was convicted of heinous crimes against a child in his care.  Considering the Rummel finding that a life sentence was not excessive under the fairly innocuous facts of that case, this Court has no hesitation in concluding that petitioner's sentences are not grossly disproportionate to the grave offenses of which he stands convicted.

Constitution and this Court, in its independent research, has located no such authority.  Accordingly, the Court finds that petitioner has not met his burden of proof with respect to this claim.

Ineffective Assistance of Counsel

Petitioner next asserts two claims that his counsel was ineffective.  When these claims were presented in the state post-conviction proceedings, they were rejected as having no merit.[16]

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  See id. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).

---

[16]  State v. Smith, No. 2006-K-0307 (La. App. 4th Cir. Apr. 11, 2006) (unpublished); State Rec., Vol. V of VI.  The Louisiana Supreme Court denied petitioner's related writ application without assigning reasons.  State ex rel. Smith v. State, 948 So.2d 192 (La. 2007) (No. 2006-KH-1419); State Rec., Vol. II of VI.

Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim.  Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. Strickland, 466 U.S. at 697.

A claim of ineffective assistance of counsel is a mixed question of law and fact. Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Therefore, this Court must defer to the state court on such claims unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

- 15 -

Petitioner first argues that his counsel was ineffective in failing to subpoena the physicians who examined the victim for evidence of sexual assault.  In lieu of calling the physicians, defense counsel introduced the underlying medical reports which found that the victim's "genital area was within normal limits" and concluded that the examination "neither confirms nor denies previous sexual abuse."

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative."  Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) (citing Sayre v. Anderson, 238 F.3d 631, 635-36 (5th Cir. 2001)).  To show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'"  Evans, 285 F.3d at 377 (quoting Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985)).

In the instant case, defense counsel introduced into evidence copies of the medical reports.  Those reports indicate that the examinations of the victim were essentially inconclusive in that they neither confirmed nor disproved a history of sexual assault.  The reports were nevertheless useful to the defense, in that they allowed defense counsel to argue that there was no physical evidence of a history of sexual assaults.  However, calling the physicians to testify would necessarily have given the prosecution an extended opportunity to undermine that benefit.  If the physicians were called to testify, they would be subject to cross-examination, which a skillful prosecutor would undoubtedly have used to highlight at length the fact that the examinations, although not proving sexual abuse, also neither disproved nor even called into question the veracity of the victim's

allegations.  Defense counsel can hardly be deemed deficient in opting to avoid that adverse consequence and to simply let the reports speak for themselves.  Further, petitioner has demonstrated no prejudice.  The examinations showed no evidence of sexual assault, a fact made known to the jurors through the introduction of the reports.  Under the facts of this case, petitioner could not realistically hope for more than that.  He has made no showing whatsoever that additional exculpatory evidence would have been brought to light if the physicians had been called to testify in person.[17]

Petitioner next claims that his counsel was ineffective in failing to introduce a timecard in his possession showing that petitioner was in fact at work at noon on August 17, 2000, which he argues is when one of the acts of forcible rape was alleged to have occurred.  He also claims that counsel was ineffective in failing to subpoena petitioner's work supervisor to verify that fact.

However, there was no evidence at trial that the forcible rape occurred at noon on August 17, 2000.  Count ten of the indictment simply states that the offense occurred "between the 12th of August, 2000, and the 19th of August, [2000]."[18]  Neither the victim nor her brother, who

---

[17]  To the extent that petitioner is similarly arguing that other persons should have been called to testify as to laboratory reports showing no evidence of seminal fluid, the Court reaches the same conclusion.  The sexual abuse in this case took place over a period of years.  Having medical personnel testify in person to the fact that no seminal fluid was found in the victim during the subsequent investigation of this case is not exculpatory.

[18]  State Rec., Vol. IV of VI, indictment.

entered the room during the rape, testified specifically as to when the offense occurred.[19]  Therefore,

any evidence regarding petitioner's whereabouts at noon on August 17, 2000, would have been

irrelevant.[20]  Counsel cannot be found deficient for failing to present irrelevant evidence, and

petitioner cannot show any prejudice resulting from the failure to do so.  See United States v.

Zegzula, No. 96-30013, 1997 WL 174165, at *2 (9th Cir. Mar. 31, 1997); Blakeney v. Lee, 2007 WL

1341456, at *44 (W.D.N.C. May 3, 2007).

        For all the foregoing reasons, the Court finds that petitioner has failed to demonstrate

that the state court's decision rejecting his ineffective assistance of counsel claims was contrary to,

or involved an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States.  Applying the AEDPA's deferential standard, this Court

likewise rejects those claims.

<u>Improper Closing Argument</u>

        Petitioner claims that the prosecutor made improper remarks during closing

argument.  When this claim was presented in the state post-conviction proceedings, it was rejected

as having no merit.[21]

---

   [19] <u>See</u> State Rec., Vol. VI of VI, transcript of April 16, 2002, pp. 98-100, 103-04, 132-33, and 180-81.

   [20]  Petitioner's claim is apparently based on the police report completed by Larry Singleton, Jr. Although no specific time for the offense is stated in the narrative of that report, in one of the blank areas at the top of the report, Singleton noted that the offense occurred on "8-17-00/12:00 PM." However, that report was not introduced at trial and there is no indication on what information that report entry was based or, indeed, if it was anything more than Singleton's own estimate.

   [21]  <u>State v. Smith</u>, No. 2006-K-0307 (La. App. 4th Cir. Apr. 11, 2006) (unpublished); State Rec., Vol. V of VI.  The Louisiana Supreme Court denied petitioner's related writ application without

Petitioner claims that, during closing arguments, the prosecutor improperly impugned the integrity of defense counsel, Brian Hart, by making the following comment after recounting the evidence in the case:

> Not good enough for Mr. Hart, though, is it?  I have a feeling that nothing we did today or could have done or would have done would have been enough for Mr. Hart because as he said [the victim] cried just a little bit, told you that story she prepared.  He's calling her a liar.  He's calling her a liar.  And that's just – that's a damned shame after all that she suffered, she has to sit here – and she sits there still.  The whole family sits still – and be called a liar. ...
> ... Somebody just wants to stand up here and call somebody a liar.[22]

As a preliminary matter, the Court notes that it finds nothing egregiously improper in the prosecutor's comments.  Although defense counsel did not use the word "liar" in his summation, he clearly implied that the state's witnesses, including the victim, were in fact lying.  For the prosecution to respond to that accusation would seem to be within the bounds of fair comment.  Further, in light of the overwhelming evidence in this case, the prosecutor's observation that it is unclear what, if anything, would be sufficient evidence of guilt for the defense seems, if not entirely proper, nevertheless fairly inconsequential.  The Court notes, as does petitioner, that not even defense counsel believed that the comments merited an objection.

In any event, even if the comments were improper, that alone would not warrant a grant of federal *habeas corpus* relief.  The United States Fifth Circuit Court of Appeals has held:

---

assigning reasons.  State *ex rel.* Smith v. State, 948 So.2d 192 (La. 2007) (No. 2006-KH-1419); State Rec., Vol. II of VI.

[22]  State Rec., Vol. IV of VI, transcript closing arguments held on April 16, 2002, pp. 30-32.

> Even if ... [a] prosecutor's remarks [are] improper,
> prosecutorial remarks are a sufficient ground for habeas relief only
> if they are so prejudicial that they render the trial fundamentally
> unfair. Such unfairness exists only if the prosecutor's remarks evince
> either persistent and pronounced misconduct or the evidence was so
> insubstantial that (in probability) but for the remarks no conviction
> would have occurred.

Harris v. Cockrell, 313 F.3d 238, 245 (5th Cir. 2002) (internal quotation marks, ellipsis, and footnote

omitted); see also Jones v. Butler, 864 F.2d 348 (5th Cir. 1989).  In other words, a prosecutor's

remarks warrant *habeas* relief only if they were "a crucial, critical, highly significant factor upon

which the jury based its verdict."  Harris, 313 F.3d at 245.

In the instant case, the comments in question were neither persistent nor pronounced.

Further, in light of the overwhelming evidence against petitioner, the Court has no hesitation in

concluding that there is no probability that the comments played any part whatsoever in the

convictions.

Petitioner has failed to demonstrate that the state court's decision rejecting this claim

was contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's

deferential standard, this Court likewise rejects the claim.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus*

relief filed by Corey Smith be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation contained in a magistrate judge's report and recommendation within 10 days after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from

a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en

banc).

New Orleans, Louisiana, this nineteenth day of June, 2007.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**